UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>  v.<br>WILLIAM KOO ICHIOKA,<br>    Defendant. | Case No. 23-cr-00190-VC-1<br><br>**RESTITUTION ORDER** |

  This order addresses the various issues raised in connection with Ichioka's restitution obligations. The ruling assumes that the reader is familiar with the facts, the applicable legal standard, and the arguments made by the parties.

  1. *Bitcoin losses.* Any Bitcoin losses will be awarded in an amount equal to what the Bitcoin was worth on the date of sentencing—not in kind. Ichioka no longer has the Bitcoin that his victims lost. And Ichioka won't be able to pay all of the restitution he owes immediately, which means he will need to pay off his restitution obligations in installments over time. This reality, paired with Bitcoin's price volatility, makes an in-kind requirement a nonstarter. The value of Bitcoin might crater by the time Ichioka has the resources to repay his victims, leaving those who lost Bitcoin with an inadequate payout. *See* 18 U.S.C. § 3663A(b)(1)(B). Ichioka might even try to take advantage of a depressed Bitcoin market to satisfy his restitution obligations on the cheap. And managing a payment plan based on a constantly fluctuating restitution total creates its own set of serious logistical challenges. Each of these problems in turn might prompt future disputes that further delay the restitution process. *See United States v. Gordon*, 393 F.3d 1044, 1054–55 (9th Cir. 2004).

Ichioka and the government agree that the Bitcoin losses should not be repaid in kind. But they insist on valuing the Bitcoin losses from the date of loss, not the date of sentencing, even though the price of Bitcoin was much higher (for most victims) on the date of sentencing. The restitution statute says otherwise—it plainly requires that the defendant pay "the greater of" those values. 18 U.S.C. § 3663A(b)(1)(B)(i). That makes sense, because Ichioka's fraud prevented victims from capitalizing on positive fluctuations in the Bitcoin market. *See People v. Ung*, 88 Cal. App. 5th 997, 1002 (2023). So it is only fair that Ichioka should have to bear that cost. *See id.*; *see also Gordon*, 383 F.3d at 1053–54; *Robers v. United States*, 572 U.S. 639, 646 (2014).

Ichioka and the government offer several arguments in response, all unconvincing. Ichioka claims there is a difference between theft cases and investment fraud cases, because only victims in theft cases lose the ability to sell their property for a profit. But victims in investment fraud cases lose out in the exact same way—the victims in this case, for instance, were unable to sell the Bitcoin that Ichioka traded away. Ichioka then cites several recent investment fraud cases that limited restitution to the cash value of what was invested at the time of loss. *See, e.g., United States v. Holmes*, 673 F. Supp. 3d 1049, 1057 (N.D. Cal. 2023). But the victims in those cases invested, and therefore lost, cash. So it made sense to value their losses in terms of the amount of cash they invested. Finally, the government at one point suggested that the victims acquired Bitcoin only to invest it with Ichioka, not because they had any prior interest in Bitcoin as an asset. But nothing in the record supports this assertion, many victims have since submitted statements rejecting it, and the government appeared to abandon this argument in the second round of supplemental briefing.

2. *Co-conspirator exception.* Ichioka argues that Arends is not entitled to any restitution because he was a co-conspirator. The idea that Arends was a co-conspirator is certainly plausible. But the conclusion that Arends is not entitled to any restitution fails, for two independent reasons. First, Ichioka already stipulated in his plea agreement that he owes Arends restitution. And the government, consistent with that position, continues to seek restitution on

Arends's behalf. Ichioka cannot back out now and insist that Arends was a co-conspirator all along. Ichioka does not dispute that he is bound by the terms of the plea agreement. Ichioka instead argues that the plea agreement does not require him to pay restitution to any particular victim. But the plea agreement speaks for itself: It says that Ichioka agrees "to owing restitution no less than the amounts listed to each individual or entity listed in Attachment A (Non-Family Investors) totaling more than $21 million." Dkt. No. 2 at 8. And Arends is an individual listed in Attachment A. The only plausible reading of that language is that certain victims (listed in Attachment A) lost specific amounts of money (also listed in Attachment A) and that Ichioka agreed to pay the listed victims (including Arends) no less than the listed amounts. Nothing in the agreement, the plea colloquy, the sentencing memo, or the sentencing hearing suggests otherwise.

Second, even setting the plea agreement aside, the record does not support Ichioka's contention that Arends was a co-conspirator. None of the evidence comes close to proving that Arends knew about Ichioka's fraud or that he shared Ichioka's criminal intent. True, many victims likely wouldn't have invested had Arends not solicited their money. And there is no doubt that someone in Arends's position should have known better. But all of this suggests at most that Arends bears some responsibility for other victims' losses. That is not the same thing as being in on the scheme all along. *See United States v. Lazarenko*, 624 F.3d 1247, 1252 (9th Cir. 2010); *United States v. Emor*, 850 F. Supp. 2d 176, 209–10 (D.D.C. 2012).

3. *CASL losses.* Arends ended up pocketing some of the money that he had solicited from the CASL victims based on Ichioka's fraudulent promises. Ichioka argues that he shouldn't have to pay restitution for these losses because his connection to them is too attenuated. It's worth noting the tension between this argument and Ichioka's contention that Arends was a co-conspirator: if it's true that Ichioka and Arends were co-conspirators all along, then Ichioka is on the hook for any money that Arends solicited as part of the same fraudulent scheme—even if Arends kept a cut of the money for himself. *See United States v. Feathers*, 518 F. App'x 536, 537 (9th Cir. 2013). But even setting that point aside, the record supports the government's view

that Ichioka should have to pay restitution for these losses too. The CASL victims wouldn't have invested this money had it not been for Ichioka's fraudulent promises. And it was foreseeable that a middleman like Arends would keep a cut of any investments he solicited before passing the rest along to Ichioka. *See id.*; *see also United States v. Swor*, 728 F.3d 971, 974–75 (9th Cir. 2013).

      4. *CASL Systems losses.* Ichioka also argues that he shouldn't have to pay restitution for any CASL Systems victims' losses, because he didn't have control over the accounts that contained these funds. But Ichioka does not dispute that he could access these accounts, that he promised CASL Systems 8% monthly returns on its investments, and that he traded the accounts down to nothing. *See* Dkt. No. 59 at 82. The fact that Ichioka needed approval before withdrawing money from the accounts—or that Arends kept a chunk of the investments for himself—does not make Ichioka's connection to these losses too attenuated for restitution purposes.

      5. *Accounting issues.* A few victims raised more specific concerns with the government's restitution calculations. A number were raised by Arends: Arends claims he made two cash payments to Ichioka—one for $10,000 and another for $50,000—that were never reflected in the government's restitution spreadsheet. The government has since clarified that the $10,000 amount has been incorporated into the latest restitution totals. And as the government has explained, the $50,000 amount—the result of an alleged stock transfer in the middle of 2023—falls outside the course of Ichioka's fraudulent investment scheme. Arends also claims that the government incorrectly offset his losses by $183,345. But Arends acknowledges that this amount reflects the sum of money that he withdrew from CASL as one of its principals. And CASL itself profited from Ichioka's scheme by taking a cut of the investments that its principals collected and a cut of the returns that Ichioka made on those investments. So it is appropriate to deduct these earnings from Arends's losses. *See* 18 U.S.C. § 3663A(b)(1)(B)(ii). Similarly, another investor—listed as "SL" on the government's restitution spreadsheet—claims that the government incorrectly offset his losses by $578,745. As with Arends, an offset is appropriate,

4

because this sum reflects profits that SL earned through CASL from Ichioka's scheme. Finally, Arends argues that the restitution spreadsheet incorrectly omitted 3.8 Bitcoin that various CASL investors lost. But it would not be appropriate to order restitution for these specific losses, because neither the government nor Arends has been able to identify any investor who suffered them. *See United States v. Doe*, 374 F.3d 851, 854 (9th Cir. 2004).[1]

A few other investors submitted statements of their own, claiming that the government incorrectly omitted some of their losses from the restitution spreadsheet. *See* Dkt. No. 108. One victim, listed as "PG," claims $25,000 and 4.718 Bitcoin in omitted losses. The parties agree that Ichioka should have to pay restitution for these losses. Another investor, listed as "GWS," claims $500,000 in omitted losses. As GWS's letter explains (and as Ichioka acknowledges), these losses are similar to the losses suffered by the CASL Systems victims—after investing with Ichioka through CASL, GWS placed another $500,000 into a separate account that Ichioka could remotely access and that Ichioka eventually traded down to nothing. So just as Ichioka owes restitution to the CASL Systems victims for their losses, Ichioka is on the hook for GWS's $500,000 loss too. *See United States v. Johnson*, 875 F.3d 422, 426 & n.5 (9th Cir. 2017). Finally, someone listed as "CW" submitted a claim for $4 million, plus some Bitcoin. But CW is not entitled to restitution for these amounts, because the government has not proven that CW was a victim of the same scheme that Ichioka pleaded guilty to. *See In re Her Majesty the Queen in Right of Canada*, 785 F.3d 1273, 1276–77 (9th Cir. 2015) (per curiam). Nothing shows that Ichioka ever promised to earn 10% monthly (or similarly bogus) returns on CW's investments. It does not appear that CW invested any of his money through CASL or CASL Systems, and the promissory notes that CW submitted show instead that Ichioka promised him 24% annual returns—on this record, it is unclear whether this far more modest guarantee was also fraudulent.

6. *Attorneys' fees.* Arends's request for attorneys' fees is denied. Given that the

---

[1] Arends at one point suggested that a special master should be appointed to oversee the restitution process. But everyone at the restitution hearing appeared to agree that a special master would not be worth the trouble, especially because the government retains the ability to go after Ichioka's assets in the future.

government has done such a poor job of teeing up the restitution issues for resolution, it's no wonder that victims like Arends took it upon themselves to do some of the government's work for it. But the MVRA does not require defendants to reimburse victims for costs incurred pursuing their own private investigations. *Lagos v. United States*, 584 U.S. 577, 581 (2018).

7. *Prejudgment interest.* Arends argues that the victims should be awarded prejudgment interest for their cash losses. For whatever reason, neither the government nor Ichioka took a position on whether that would be appropriate. But it's fair to conclude that, had Ichioka not defrauded them, these victims would've invested their money elsewhere or used it "for some other productive purpose." *Gordon*, 393 F.3d at 1059. To cover these lost opportunity costs, Ichioka is ordered to pay prejudgment interest on any cash losses.[2]

8. *Payment schedule.* Because Ichioka does not have the resources to pay all of the restitution he owes immediately, Ichioka and the government have agreed to a payment plan that specifies his minimum restitution expectations and explains how his crypto tokens will be made available for restitution—all while reserving the government's right to take further enforcement measures going forward. *See* 18 U.S.C. § 3664(f)(2). The Court will adopt this plan, which will be reflected in an amended judgment.[3]

**IT IS SO ORDERED.**

Dated: June 4, 2024

VINCE CHHABRIA
United States District Judge

---

[2] Because it would be too speculative to assume that the victims who lost Bitcoin would have liquidated their Bitcoin assets and used the cash proceeds for "some other productive purpose," awarding prejudgment interest on the Bitcoin losses would not be appropriate. *Gordon*, 393 F.3d at 1059–60.

[3] Ichioka and the government also agreed that, while Ichioka is incarcerated, his civil attorney will hold onto the digital key that accesses the wallet containing the crypto tokens. As part of that arrangement, the attorney submitted a declaration promising to assist the government with unlocking the wallet and transferring or liquidating its assets, until Ichioka's restitution obligations have been paid in full. *See* Dkt. No. 99.